UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| NORMAN CAIRNS, on behalf of himself and others similarly situated,<br><br>                    Plaintiff,<br>vs.<br><br><br>AVIS BUDGET GROUP, INC., and SEDGWICK CLAIMS MGMT SERVICES—ABG RECOVERY US,<br><br>                    Defendants.<br>_____ | CAUSE NO<br><br>CLASS ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES AND FOR<br><br>TORT –FRAUD<br><br>TORT – EXTORTION<br><br>TORT – INTERFERENCE WITH CONTRACT<br><br>INTENTIONAL MISREPRESENTATION<br><br>VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT<br><br>UNJUST ENRICHMENT<br><br>INJUNCTIVE RELIEF and<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR DAMAGES AND PETITION FOR INJUNCTIVE RELIEF**

Plaintiff/Petitioner Norman Cairns (Plaintiff), attorney at law, pro se, pursuant to 28

U.S.C. §§ 1332(d), 1453, 1711–15 and Federal Rules of Civil Procedure 23 and 65, requests

damages and requests the Court enter an injunction against Defendant/Respondent Avis Budget

1

Group, Inc. and against Defendant/Respondent, Sedgwick Claims Management Services—ABG Recovery US (Sedgwick).[1] [2]  As a basis for the request, the Plaintiff states:

## JURISDICTION

1. Plaintiff is a private investigator and retired attorney residing in Albuquerque, Bernalillo County, State of New Mexico, and is representative of the Classes as defined in this Complaint.

2. Defendant Sedgwick is a Tennessee corporation transacting business in Albuquerque, Bernalillo County, State of New Mexico.

3. Sedgwick has more than minimum business contacts with the District of New Mexico.

---

[1] Some of the factual allegations in the Complaint may be lodged against companies or individuals who are not parties to the Action.  All factual allegations are relevant to the Complaint and were necessary in order to tell a cognizable story.  In the interests of fairness, the Plaintiff will provide a conformed copy of the Complaint/Petition to parties who are mentioned in it, but from whom the Complaint seeks no relief.  Plaintiff will serve the conformed copy contemporaneous with the serving of the Complaint on the Defendants.  The Plaintiff is not asking the Court to enter an order or judgment against third parties, but if those third parties wish to respond to the factual allegations, the Plaintiff has no objection to the filing of a third-party response.  The Plaintiff strongly objects to an interpleader for reasons set forth in the Complaint.  The parties who might interplead lack the information do so.  The additional factual basis in the Complaint is necessary to establish the lack of any basis for an interpleader.

[2] Footnotes to this complaint contain explanatory or background information, not allegations that would need necessarily to be admitted or denied.  Without the explanatory information, the Complaint would make less sense, but including the explanation information in numbered paragraphs as allegations would unnecessarily lengthen an already lengthy complaint.  Moreover, it would force the Defendants to admit or deny background information, about which the Defendants have no knowledge.  In the interest of fairness, Plaintiff will not argue that any failure to address information contained in a footnote constitutes an admission of that information on the part of the Defendants.  **All** information contained in the footnotes will be considered to have been "denied, based on insufficient information."  Of course, the Defendants have the option of addressing specific information in the footnotes, should they desire to do so.

4.  Sedgwick is seeking to hire employees in Albuquerque. Attachment P.

5.  Sedgwick handles claims for the Budget Rental Car office[3] in Albuquerque. Attachment E.

6.  Sedgwick is tasked with handling the claim resulting from events that transpired in the District of New Mexico.

7.  Avis Budget Group, Inc., is a New Jersey corporation transacting business in Albuquerque, Bernalillo County, State of New Mexico.

8.  Avis and Budget are part of the same company.

9.  Avis Budget Group has three car rental offices operating in Albuquerque.

10. Events giving rise to the Complaint occurred in the New Mexico.

11. The Defendants are engaged in interference with a contract, specifically a contract between Plaintiff and Plaintiff's insurance carrier, which contract was executed in Albuquerque.

12. The Defendants committed fraud in Albuquerque.

13. The events giving rise to the Complaint occurred predominately in Bernalillo County, State of New Mexico, but also in Socorro County, State of New Mexico.

14. Events that occurred over the internet, or via email, are in and affecting interstate commerce.

15. This Court has diversity jurisdiction over this Action as the Plaintiff and most Class members reside in states other than Tennessee and New Jersey, the home states respectively of the Defendants.

---

[3] For purposes of brevity, Budget and Avis are referred to as "Budget."

16. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as to the named Plaintiff and every member of the Classes because the Classes contain more than 100 members, the aggregate amount in controversy exceeds $5 million, and members of the Classes reside across the United States and are therefore diverse from the Defendants.  The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This Court has personal jurisdiction over Defendants because they have significant minimum contacts with the District of New Mexico, and/or it otherwise intentionally availed themselves of the laws and markets of New Mexico through insurance claims adjustment activities in New Mexico and through mail and the internet to Class members in New Mexico.

18. The claims asserted herein arise from Defendants' contacts with New Mexico.

19. This Court's exercise of jurisdiction over the Defendants is permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

21. Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

22. Jurisdiction and venue lie in this Court.


## FACTS

23. The Plaintiff is informed and believes that other similarly situated individuals have suffered and will suffer from events identical, or nearly so, to those set forth herein.

24. In August of 2022, Plaintiff attended a seminar near Socorro, New Mexico.

25. On August 26, Plaintiff was involved in a one-vehicle accident while driving a rental pickup truck near Socorro.

26. Before the trip, Plaintiff rented the pickup truck (Toyota) from the Budget Rental Car office (Budget) at the Albuquerque Sunport.

27. Before the trip, while in Albuquerque, Plaintiff purchased an auto insurance policy from AIG Travel Guard to cover potential damages to the Toyota in the event of an accident. Travel Guard Policy 1251105055.  Attachment A.

28. The insurance policy covered $50,000 in unforeseen damages to the Toyota. Attachment A.

29. The Toyota, VIN 3TMCZ5AN4MM399721, suffered damage in the accident and was undriveable.  Attachments B and C.

30. The Plaintiff was not violating the traffic code when the accident occurred and received no citation from investigating authorities.

31. It was a garden-variety one vehicle, one driver, accident.

32. Plaintiff is responsible for the accident.

33. Plaintiff is liable for the accident.

34. Budget is entitled to damages resulting from the accident, including repair bills, loss of use damages and/or the actual cash value of the Toyota.

35. Plaintiff regrets wrecking Budget's vehicle and is willing to pay legitimate damages.

36. Plaintiff paid $1672.92 in additional storage fees for the Toyota, which were a direct and proximate cause of the accident.  See Attachment D.

37. These accident-related expenses remain outstanding.

38. After the accident, Budget transferred its claim against Plaintiff to Sedgwick.

39. On October 14, 2022, Plaintiff received a letter from Sedgwick stating that total damages to Toyota were in the amount of $8,311.91, and demanding payment, without any form of supporting documentation, i.e., repair bills, bills of sale, etc. Attachment E.

40. The Plaintiff submitted the letter from Sedgwick to AIG Travel Guard (AIG), the insurance carrier.

41. In early March of 2023, Plaintiff contacted Keith Hicks of Sedgwick (Hicks) and AIG Travel Guard representative Jesse Mays (Mays) to resolve the claim.

42. Mays informed Plaintiff that the Toyota had not been damaged in the accident but had suffered "a loss in value" while Plaintiff was driving it, which loss in value is not covered by the insurance policy.

43. Plaintiff contacted Hicks to clarify that the Toyota had been damaged in an accident, and that the loss in value was due to the Toyota having been damaged in the accident, not as a result of wear, tear or mileage.

44. Hicks told Plaintiff only that the Toyota had been sold.

45. On March 10, 2023, Plaintiff received a letter from Sedgwick stating that the total damages to the Toyota were $14,188.41.  Attachment F.

46. The cost of repairing, selling, or disposing of the Toyota had risen by $5876.09 between the time when Sedgwick sent its first demand letter in October of 2022 and when it sent the demand letter in March of 2023.  Attachments E and F.

47. The March letter demanded immediate payment and threatened to refer the new claim amount to a collection agency, if the Plaintiff did not pay.

48. The letter also stated that it represented Sedgwick's last communication with the Plaintiff.

49. On March 10, 2023, Plaintiff received also an email from Mays, requesting permission to pay Sedgwick directly, and which provided no amounts.  Attachment K.

50. On March 20, 2023, at Plaintiff's request, Plaintiff received a 41-page packet of materials from Sedgwick.  Attachment I and H.

51. The packet of materials contained Sedgwick estimates as to repairs and sales value.

52. The packet of materials contained no direct documents relating to the actual repairs or sale of the Toyota, no receipt, no bill of sale, no transfer of title.

53. The only documentation representing either actual sale or actual repair of the Toyota was a quarter page photocopy of something called the "MVA Vehicle Display." Attachment N.

54. A google search "MVA Vehicle Display" produced no result. [4]

55. Based on the MVA Vehicle Display, Budget sold the Toyota on October 19, 2022 -- five days after Sedgwick's first demand letter **--** and four months before issuing Sedgwick's second demand letter that nearly doubled the damages allegedly due from the Plaintiff.

56.  According to the MVA Vehicle Display, Budget asked $29,000 for the Toyota.

57. According to the MVA Vehicle Display, the selling price of the Toyota was $28,773.50. [5]

58. The average value of a vehicle sold for salvage is $675.[6]

59. According to the MVA Vehicle Display, the Toyota had 48,142 miles on the odometer.

60. Beyond the MVA Display, the packet of materials contained a lengthy series of predictions about what the repairs to the Toyota would be, or what the sales value would be.

61.  The analysis concluded that a 2021 Toyota pickup, with 48,000 miles on it would be worth $38,853.00, almost thirty-nine-thousand dollars, and more than the manufacturer's suggested retail price for Toyota.  Attachments B, H, S and U.

---

[4] One might infer that "MVA" stands for Motor Vehicle Auction, but such an assumption would be speculation on the part of the Plaintiff.

[5] The difference between the asking price of $29,000.00 and $28,773.50 is presumed to be the auction fee.

[6] This represents an estimate on the part of Plaintiff; the real value would not be a larger or smaller number by any great measure.  This full explanation is offered in a later footnote after it has become more relevant.

62. The analysis appears to have reached its conclusion as to the value of the used Toyota by comparing it to a single other vehicle, a pickup for sale in Texarkana.  Attachment B.

63. Autotrader.com posts the following ads:

    A.  2023 Toyota Tacoma Sports Rally, TRD off-road pickup truck is for sale for $30,703.  Attachment 0-1.  It has no miles.  It is new.

    B.  2021 Toyota Tacoma SR5, with 55,682 miles is selling for $13,250.00.  Attachment O-2.

    C.  2021 Toyota Tacoma, TRD Off-Road, with 36,000 miles – and which would appear identical to the subject Toyota of this Complaint, only with fewer miles – is for sale for $13,950.  O-3.

    D.  2021 GMC Acadia Denali w/ Denali Ultimate Package -- the most luxurious truck in the world according to Top Speed -- is for sale for $37,400.  It has about half as many miles on it as the Toyota does.  O-4.

64. Based on the information in the 41-packet, the estimated repair bills for the Toyota were $11,644.45.

65. On March 21, 2023, the Plaintiff, having reviewed the packet and finding that it contained estimates, one photocopy of a computer printout and no actual bills, requested again documentation from Sedgwick regarding the repair and sale of the Toyota.  Attachment I.

66. On April 21, 2023, Plaintiff received an email from Hicks requesting again that Plaintiff authorize the insurance carrier, AIG Travel Guard, to pay Sedgwick and Budget directly.  Attachment J.

67. The email contained no mention of releasing the Plaintiff from liability -- after AIG Travel Guard paid.

68. On May 30, 2023, Plaintiff received a voice mail from the Mays stating that AIG Travel Guard would pay $10,079.50 of the $14,188.41.  See Attachment G.

69. Mays offered no explanation of why AIG Travel Guard was willing to pay $10,079.50, as part of a claim that was once $8311.91 in its entirety, without receiving a receipt from Sedgwick for repairs or sale of the Toyota.

70. Plaintiff contacted Sedgwick four times between the months of April and May of 2023.  Attachments I.

71. The prior communications are not set forth here because they were not recorded.

72. On May 31, 2023, Plaintiff received an email from Hicks sent to Mays, copied to the Plaintiff, and intended for the Plaintiff, classifying the Toyota as a total loss:

   Hello Jesse, as you know, the salvage has been sold.  It was NOT repaired.  I have never relayed that the rental was repaired to anyone.  Per our communication, you are in possession of all the documents.  As you as [sic] know was relayed to you.  We are self-insured, which allows us to settle a claim as an unrepairable total loss vehicle which is not an industry total which in most cases you carrier does not honor our total loss if te estimate does not meet industry standards of what is deemed a true total.  However I can negotiate the settlement of this vehicle.  This claim has been delayed for too long now.  On June 12, I will be referring this claim over to our collection agency for nonpayment.

Attachment L.

73. According to Hicks, the repairs estimated for the Toyota in Attachment H – and which formed the basis for Sedgwick's original demands -- were never done.  Attachment L.

74. The estimates in Attachment H were prepared by Property Damage Appraisers (PDA Albuquerque, NM).

75. The listed address for Property Damage Appraisers (PDA Albuquerque) is 524 Gibson Blvd SE, Albuquerque, NM 87102.

76. The business is permanently closed and, from its exterior, would not appear to be connected to anything identifiable as "PDA."  Attachment W.

77. At Sedgwick's request, PDA determined the following were the direct result of the accident:

    a.　 PDA stated that the luggage rack on the roof of the Toyota had been damaged and needed to be replaced.  Exhibit H.

    b.　The Toyota appears to have never had a luggage rack.  Exhibit C.

    c.　PDA stated that the right front rear view mirror was damaged in the accident and needed to be replaced.  Attachment H.

    d.　The right front rear view mirror would appear to have not been involved in the accident and is unbroken.  Exhibit C.

    e.　PDA stated that the right front door handle was damaged in the accident and needed to be replaced.  Attachment H.

    f.　The right front door handle appears to be undamaged.[7]  Attachment C.

78. Plaintiff filed a petition in state court seeking to enjoin Sedgwick from damaging Plaintiff's credit rating until the dispute over damages from the accident could be resolved.  *Cairns v. Sedgwick*, Cause No. D-202-CV202304356.

---

[7] These discrepancies were observed during a cursory review of the documents, of the photos, as well, and using common sense.  The Plaintiff is not a mechanic.

79. On July 25, 2023, Plaintiff received a copy of a Bill of Sale for the Toyota from the attorney representing Sedgwick in the state action.  Exhibit R.

80. The attorney representing Sedgwick told the Plaintiff that Sedgwick would not pursue collection activities against the Plaintiff until after a court or arbitrator had determined damages.

81. According to the Bill of Sale, Budget sold the Toyota at the Mannheim Car Auction House at 3411 Broadway Blvd SE, Albuquerque, NM 87105.  Attachment R.

82. Mannheim Car Auction House does not repair vehicles prior to sales.

83. The vehicles are sold in lanes; in other words, the vehicles drive through the auction house and are sold as they travel.

84. Mannheim sells used vehicles in lanes and sells also "total resources" or salvage vehicles.

85. Budget sold the Toyota sold on October 19, 2022, for $29,000 to Houston Wholesale Cars.  Attachment R.

86. Budget sold the Toyota "in lane."

87. Houston Wholesale Cars is a used car lot at 4718 Lomas Blvd NE, Albuquerque, NM 87110.

88.  Houston Wholesale Cars is not a salvage yard.

89.  The Carfax report for the Toyota shows no salvage title.  Attachment U.

90.  The manager at Houston Wholesale Cars was not forthcoming with information; however, Houston Wholesale Cars does not repair vehicles prior to sale; Houston Wholesale Cars does not purchase "wrecks" as the manager described them.

91.  As the manager described it, Houston Wholesale Cars is in the business of purchasing vehicles strictly for resale.

92.  An internet archive photo shows the Toyota for sale at Houston Wholesale Cars. Attachment T.

93.  It had been repaired.

94.  In candor to the Court and to the Defendants, the undersigned acknowledges that he was able determine that Houston Wholesale Cars sent the Toyota for repair, notwithstanding the manager's general statement.[8]

95.  Houston Wholesale Cars sent the Toyota to Jerry Anthony Trujillo of Albuquerque. Trujillo is a handyman who does repair work as a side job.

96.  The Toyota was at Trujillo's home in March or April of 2023, some months after the auction and based on investigative materials and internet archive photos, sometime after the Toyota had appeared for sale on Houston Wholesale Cars' inventory.

97.  Trijillo's wife, Esther, stated that Trujillo had the vehicle for a few days only and did some minor cosmetic work on one of the fenders.  Esther Trujillo stated that her husband does not perform major structural repairs and lacks the equipment to do so.

98.  On July 30, 2023, Plaintiff obtained a report from the National Motor Vehicle Title Information System (NMVTIS).  Attachment S.

---

[8] The way that Plaintiff was able to determine this is not complicated but would be cumbersome to set forth and involves some proprietary technology.

99. The NMVTIS reports recorded sales values and mileage for a particular vehicle. [9]

100.    The Toyota appeared on the inventory of Houston Wholesale Cars between the months of October 2022 and April of 2023.  Attachment S, NMVTIS.3

101.    According to the NMVTIS on August 20, 2022, the Toyota had mileage of 47,237.

102.    According to the NMVTIS, on September 2, 2022, after the accident, the Toyota had a mileage of 47,840.

103.    Logically, the difference in mileage of 603 miles represents, at least in part, Plaintiff's trip to Socorro and travel to-and-from the seminar location.

104.    According to the NMVTIS, the title transferred from Budget to Houston Wholesale Cars, LLC., on October 20, 2022, consistent with the Bill of Sale.

105.    According to the NMVTIS, the Toyota had a mileage of 48,142, on October 20, 2022.

106.    Based on Sedgwick's damage assessment, the Toyota had a broken wheel, the front suspension was out of alignment, and the pickup bed was broken.  Attachments H and C.

107.    Visible from the photographs in Attachments C, the Toyota is missing one tire after the accident.

---

[9] Plaintiff acknowledges the NMVTIS does not contain detailed information and can contain inaccuracies.  The NMVTIS contains information from multiple sources, and the information coming out of the system is only as accurate as the information going into the system.  The Plaintiff alleges only that the NMVTIS provided the information, not that the information is completely accurate.

108.    Based on the mileage from NMVTIS, the damage assessment, the photographs and Keith Hick's email dated May 31, 2023 – "It was NOT repaired" – the Toyota was driven with a broken wheel and while missing a tire. [10]  Attachment S.

109.    On August 1, 2023, Plaintiff met again with the attorney representing Sedgwick.

110.    Plaintiff presented the attorney with the allegations and investigative findings that are contained in this Complaint.

111.    Plaintiff provided Sedgwick an opportunity to respond to the allegations and findings.

112.    Sedgwick's attorney tried to comply with Plaintiff's multiple requests for information and provided Plaintiff with photos of the Toyota from Budget and from Mannheim Auction House, showing the Toyota with damage.  Attachment X.

113.    Plaintiff had not seen some of the photos from Sedgwick (Budget) that were on display at the attorney's office.

114.    Plaintiff was not provided with a copy of the photos from Sedgwick.

115.    According to Sedgwick, the Plaintiff is responsible for damages resulting from the accident; indeed, Plaintiff is responsible.

116.    Yet, the email from Sedgwick's attorney acknowledges that Sedgwick and/or Budget has information about the damage and about the accident that the Plaintiff does not have, or did not have until August of 2023, after almost a year of pursuing information about the accident and resulting damage.

---

[10] Plaintiff acknowledges that the NMVTIS, combined with all documentation in the case, could be subject to different interpretations.

117.    Sedgwick retains at least some of these documents; Plaintiff was not provided a

copy.[11]

118.    New Mexico defines a salvage vehicle as:

"salvage vehicle" means **a vehicle**:

(1) other than a nonrepairable vehicle, of a type subject to registration **that has been wrecked, destroyed or damaged** excluding, pursuant to rules issued by the department, hail damage, **to the extent that the owner**, leasing company, financial institution or the insurance company that insured or is responsible for repair of the vehicle **considers it uneconomical to repair the vehicle and that is subsequently not repaired by or for the person who owned the vehicle at the time of the event resulting in damage**; or

(2) **that was determined to be uneconomical to repair and for which a total loss payment is made by an insurer, whether or not the vehicle is subsequently repaired**, if, prior to or upon making payment to the claimant, the insurer obtained the agreement of the claimant to the amount of the total loss settlement and informed the claimant that, pursuant to rules of the department, **the title must be branded and submitted to the department for issuance of a salvage certificate of title for the vehicle**;

N.M. Stat. Ann. § 66-1-4.16 (1978) [emphasis added].

A. "salvage-branded title" or "salvage title" means a title issued by the motor vehicle division which title indicates the subject vehicle is a salvage vehicle; and

B. "salvage vehicle" means a vehicle that meets the definition of a salvage vehicle as defined in Subsection C of Section 66-1-4.16 NMSA 1978 of the Motor Vehicle Code.

N.M. Admin. Code 18.19.3.50

---

[11] In fairness to Sedgwick's counsel, counsel informed Plaintiff that Plaintiff could view the documents for as long as Plaintiff desired. There is nothing in the investigation that would indicate that Sedgwick's counsel was trying to hide anything. It would appear that he was acting on directives from his client.

A salvage-branded title must be issued to transfer title to a salvage vehicle.

      ****

D. **The declaration by an insurance company that a vehicle is a salvage or non-repairable vehicle makes the vehicle a salvage vehicle or non-repairable vehicle regardless of the relative amounts of repair costs versus fair market value.**

    N.M. Admin. Code 18.19.3.52 [emphasis added].


A. The procedures specified in 18.19.3.53 NMAC govern the transfer of title to a salvage or non-repairable vehicle.

****

C. Transfer to person other than an insurance company: The steps below are to be followed whenever the owner of a salvage vehicle or a non-repairable vehicle transfers title to any person other than an insurance company.

(4) If the title or MCO [Manufacturers' Certificate of Origin] is not already branded with the word "SALVAGE" or "NON-REPAIRABLE", the transferor shall stamp or otherwise mark in ink the face of the title or MCO with the word "SALVAGE" or "NON-REPAIRABLE" in letters no less than one-half inch high, at an angle of approximately 45 degrees to the text of the title or MCO. The branding shall not cover the portion of the title or MCO which describes the vehicle.

(5) **If the vehicle is a non-repairable vehicle, the owner may not transfer ownership to any person who is not a licensed auto recycler.**

(6) The transferor shall submit a copy of the branded title or MCO to the motor vehicle division. If the title or MCO had not previously been branded with the word "SALVAGE" or "NON-REPAIRABLE", the transferor shall submit with the title or MCO a written explanation explaining the reason for the branding.

D. **Once a title has been salvage-branded, all subsequent transfers of title must be by salvage-branded title. Once a non-repairable vehicle certificate has been issued for a vehicle, the motor vehicle division shall not issue further ownership certificates for that vehicle.**

    N.M. Admin. Code 18.19.3.53 [emphasis added].


        121.      The New Mexico Motor Vehicle Division refuses the issuance of a

title to a vehicle with a Salvage Certificate pursuant to N.M. Stat. Ann., Section 66-3-

7B because "the vehicle is unfit or unsafe to be operated or moved upon the highways." https://www.mvd.newmexico.gov/chapter-9-reconstructed-rebuilt-salvage-and-nonrepairable-vehicles/.

121.    Both salvage title and salvage certificate can be used to identify a vehicle's branding and other vehicle information. *Id*.

122.    The difference between a salvage certificate and salvage title is that a vehicle issued a salvage certificate may not be operated on public roadways, while a vehicle issued a salvage title, sometimes and in limited circumstances, can. *Id*.

123.    Converting a salvage certificate to a salvage title requires a safety inspection from a certified safety inspection station and a VIN verification from an authorized VIN verification agency. *Id*.

123.    New Mexico has no certified safety inspection station programs. *Id*.

123.    The New Mexico Motor Vehicles Division may issue a non-repairable vehicle certificate. By doing so, the owner would not be able to register the vehicle for use on roads and highways and would only be able to sell the vehicle to a licensed dismantler. *Id*.

122.    The bottom line is when one is purchasing a car, especially in New Mexico:



 

123.    Sedgwick declared the vehicle to be a total loss or economically unrepairable.

Under state law, the title for the Toyota should bear a "salvage" brand and cannot be

resold or even driven on public roads.

124.    The title to the Toyota was resold from Budget to Houston Wholesale Cars

where it was placed on the car lot for resale and then ultimately resold at

auction.

125.    Plaintiff received a copy of the title from Sedgwick's attorney; Houston

Wholesale Cars got this from Budget:

# STATE OF CALIFORNIA

## CERTIFICATE OF TITLE

V30210127A6

VEHICLE HISTORY

**COMMERCIAL**

| VEHICLE ID NUMBER | YR MODEL | MAKE | PLATE NUMBER |
|---|---|---|---|
| 3TMCZ5AN4MM399721 | 2021 | TOYT | 83900Y2 |

| BODY TYPE MODEL | AX | UNLADEN WEIGHT | FUEL | TRANSFER DATE | FEES PAID | REGISTRATION EXPIRATION DATE |
|---|---|---|---|---|---|---|
| PK | 2 | 04445 | G | | #538 | 01/31/2022 |

| YR 1ST SOLD | CLASS | YR | MO | EQUIPMT/TRUST NUMBER | ISSUE DATE |
|---|---|---|---|---|---|
| 2021 | JX | | 00 | | 01/27/21 |

| MOTORCYCLE ENGINE NUMBER | ODOMETER DATE | ODOMETER READING |
|---|---|---|
| | 01/27/2021 | 7 MI |
| | ACTUAL MILEAGE | |

REGISTERED OWNER(S)

P V HOLDING CORP
5721 W 96TH ST
LOS ANGELES CA 90045

- - - - -

I certify (or declare) under penalty of perjury under the laws of the State of California that **THE SIGNATURE(S) BELOW RELEASES INTEREST IN THE VEHICLE.**

1a. _____ X _____
    DATE              SIGNATURE OF REGISTERED OWNER

1b. _____ X _____
    DATE              SIGNATURE OF REGISTERED OWNER

Federal and State law requires that you state the mileage upon transfer of ownership. Failure to complete, or providing a false statement may result in fines and/or imprisonment.

The odometer now reads [ ][ ][ ][ ][ ][ ] (no tenths), miles and to the best of my knowledge reflects the actual mileage unless one of the following statements is checked. Mileage is VOID if altered or erased.

**WARNING** ☐ Odometer reading is not the actual mileage. ☐ Mileage exceeds the odometer mechanical limits.

*I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

| DATE | TRANSFEROR/SELLER SIGNATURE(S) | DATE | TRANSFEREE/BUYER SIGNATURE(S) |
|---|---|---|---|
| | X | | X |
| PRINTED NAME OF SELLER OR AGENT SIGNING FOR A COMPANY | | PRINTED NAME OF BUYER OR AGENT SIGNING FOR A COMPANY | |

*IMPORTANT READ CAREFULLY*

Any change of Lienholder (holder of security interest) must be reported to the Department of Motor Vehicles within 10 days.

LIENHOLDER(S)

MELLON

2. X
   Signature releases interest in vehicle. (Company names must be countersigned)
   Release Date

CA201601613

023A05

126.    Plaintiff requested any additional copies of the title from Sedgwick's attorney.

127.    Sedgwick's attorney told Plaintiff he does not have any other copies of the title, and Plaintiff believes the attorney to be a truthful man.

128.    The Plaintiff does not know if there are other copies of the title and acknowledges there may be.[12]

129.    Based on the available evidence, rather than sitting in a salvage yard awaiting dismantling for scrap and parts, as required by law, the Toyota is on the road somewhere today.

## ENIGMAS

130.    There is no lawful reason why Sedgwick would refuse to send documentation regarding repairs and disposition of the Toyota to the Plaintiff; doing so would resolve the case.

131.    There is no lawful reason Sedgwick would send two extortion messages before sending receipts for actual damages.

132.    There is no lawful reason why the cost of repairing or selling the Toyota would increase by $5876.09 in the span between Sedgwick's first demand letter and its later

---

[12] The attorney representing Sedgwick provided the title **he had** immediately, upon request, and without reservation. Plaintiff does not believe that the attorney representing Sedgwick acted in bad faith at any time or that **the attorney** was trying to hide anything. Sedgwick's attorney was courteous, professional and legitimately interested in resolving the matter. He was doing his job and doing it well.

demand letter; it is unlikely that Toyota sustained an additional damage during the five days that Budget owned it after Sedgwick issued its first demand letter.

133.    There is no lawful reason why Sedgwick would treat a vehicle that had an estimated value of almost $40,000.00 as a total loss, if the vehicle needed only $11,000.00 in repairs.

134.    There is no reason why there would be no salvage title for the Toyota, if the Toyota were a total loss and sold as scrap.

135.    If Houston Wholesale Cars purchased the Toyota for $29,000.00, and requiring $11,000 additional money in repairs, there is no way Houston Wholesale Cars can sell the Toyota for $38,000 – the asking price – and make any profit from the transaction.

136.    There is no lawful reason why Sedgewick's damage appraisal for the Toyota would include replacement of items that had never been on the Toyota; a part cannot have been damaged in the accident if there was no such part.

137.    There is no reason why Sedgwick's market value for the Toyota would be based on a single comparison vehicle; a half-day search of autotrader.com resulted in dozens of trucks of the same make and model from which statistical analysis could be drawn.

138.    Based on the contradictory statements and evidence in this record, no one repaired the Toyota; yet it is repaired.

139.    There is no reason why Houston Wholesale Cars would buy a Toyota pickup that was a total loss, with forty thousand miles on it for $29,000.00, 40 times the average value of a vehicle sold for salvage.[13]

140.    There is no reason why Budget's copy of the title would bear no salvage mark.

141.    There is no reason a used car lot would buy a car with a salvage stamp affixed to it; it cannot be resold.

142.    There is no reason why Houston Wholesale Cars would be able to sell the Toyota to someone else as a repaired or damaged, if it had a salvage stamp affixed to the title.

143.    There is no reason why Sedgwick would have confidential documents in connection with an ordinary auto insurance case, especially so confidential that they cannot be turned over to an attorney in active litigation against the company.

144.    No one benefits from misrepresenting the disposition of the Toyota other than Sedgwick and Budget.

---

[13] $646. https://www.junkcarmedics.com/prices/, as of this writing.  Again, this number is periodically updated but not by large variances.  Salvage values vary from site to site and from state to state; not all this information is uniform or reported accurately.  These values typically follow an overall trigonometric wave pattern with chaotic idiosyncrasies around the average of about $650, with the extremes of $800 and $300.  The average in New Mexico, as of this writing, is $490.  On any given day, the average may be different from the one referenced here, but not by much.  The Plaintiff has extrapolated the average of $675, an average of the averages, which assuming the validity of underlying premises would represent only a smoother average.  The wave pattern of small deviations should continue indefinitely.  With inflation, which always rises, this number will change over time and as such has no limit, but given the current mathematical model, it would take centuries of inflation to reach a number that makes sense in Sedgwick's equations.  Plaintiff acknowledges his analysis is perhaps overly simplistic.  Plaintiff apologizes for this lengthy footnote.  His concern in providing this explanation is that someone who reads the Complaint may go to the website and observe that it has different numbers from the ones that Plaintiff has referenced here.

## CONCLUSIONS

145.    The Plaintiff is informed and believes that Sedgwick did not sell a total loss to

Houston Wholesale Cars, Inc., for $29,000 because the Toyota was not a total loss.

146.    The Plaintiff is informed and believes Houston Wholesale Cars purchased the

Toyota for $29,000 from Budget because the Toyota required fewer repairs than

Sedgwick told Plaintiff and his insurance carrier.

147.    The Plaintiff is informed and believes that Sedgwick maintains two files on many

of its claims: a secret file containing honest estimates of repairs and market values

and a second more notorious file containing fraudulent numbers.

148.    The Plaintiff is informed and believes Sedgwick and Budget lied about the

disposition of the Toyota.

149.    The Plaintiff is informed and believes Sedgwick lied about the Cost of Repairs

and about the Sales Value of the Toyota in order inflate both the cost of repairing and

the cost of replacing the Toyota.

150.    The Plaintiff is informed and believes that Sedgwick, in its regular course of

business, records vehicles as total losses when they are not total losses based any

standards other than Sedgwick's.

151.    The Plaintiff is informed and believes that Sedgwick and Budget, in their regular

course of business, record vehicles as total losses, for insurance purposes, but resell

the vehicles illegally without salvage brands to defraud the plaintiff, his insurance

carrier, prospective buyers, others similarly situated and the jurisdictions which

require salvage branding of titles.[14] [15]

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION[16]

### (Tort: Fraud)

---

[14] All of them in the United States, to the best knowledge of the Plaintiff.

[15] The Plaintiff has tried to consider alternative explanations:  One is that Hicks mischaracterized what was happening.  Hicks described the vehicle sale as "salvage," and the claim as a "total loss" when he might have meant to say that the vehicle was sold as a used car, needing repairs: thus, it would not have a salvage mark on the title.  In other words, it might have been a poor choice of words on Hick's part.  Still, under New Mexico's definitions, the vehicle would be a salvage vehicle whether Hicks described it as such or not.  If the vehicle was sold as a used vehicle for $29,000, needing $11,000 in repairs as Sedgwick claims, Houston would not have been able to purchase the vehicle, repair it and then sell it for $38,000.  Moreover, $38,000 was the list price of the Toyota at Houston.  Houston is a used car lot on calot on Lomas in Albuquerque.  One might assume that the list price is more than the price at which the vehicle might be obtained.  If the actual price of the Toyota were more like $34,000, Houston would lose $6,000 on the transaction.  Houston Wholesale Cars has been in business for twelve years and has won multiple "Best in City" awards.  It is unlikely the car shop would enter such a transaction.  Moreover, words matter. Hick is the claims administrator for the case; if he writes the Toyota is a "total loss," it is a "total loss" for purposes of Plaintiff's insurance policy.  A second possible explanation for some of the anomalies is that Budget is able legally to declare vehicles a total loss that would not normally be total losses because Budget does not want to put the vehicles back into its rental fleet.  Intuitively, this makes sense, but Budget cannot eat its cake and have it as well.  Either Budget declares the car a total loss and obtains a salvage title or Budget repairs the vehicle, sells it or puts it back into the fleet.  There is no fifth alternative.  Moreover, Budget's internal "mechanism" for determining total losses would appear in conflict with the New Mexico definition.

[16] The remaining causes of action build upon the first cause, or the fraud count.  Fraud is the nexus upon which the entire complaint pivots from one point to another.  The presentation of facts combined with reasonable inferences that support all causes of action are set forth within the paragraphs supporting the first cause in the interest of brevity.  The presentation of facts and inferences may appear elliptical, but the overall Complaint is shorter.  The writer exchanged cohesion between the paragraphs for a lack of redundancy with the thought that redundancy represented a greater evil, but redundancy remains an ominous presence throughout.  It the writer had the skill to do better, he would.

152.    Plaintiff re-alleges and incorporates by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

153.    The First Cause of Action is brought against both Defendants.

154.    Fraud and misrepresentation in New Mexico require the same elements as fraud in the ordinary sense. *Unser v. Unser*, 86 N.M. 648, 526 P.2d 790 (1978). An actionable fraud is a misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act upon it with the other party relying upon it to his injury or detriment. *Id.*

155.    Sedgwick is self-insured and has no rules other than the ones it makes for itself and those imposed by law.

156.    The bill for disposing of the Toyota increased by $5876.09, after Sedgwick sold the Toyota. Attachments E, F and N.

157.    The Plaintiff is informed and believes these additional charges are fraudulent adjustments representing the sale of the Toyota without a salvage mark as required by law.[17]

158.    One must assume that the Toyota had no salvage mark on the title when it sold at auction; to assume otherwise would mean that the auction house and Houston

---

[17] The events that transpired must be reconstructed with the available evidence and through deductive reasoning. The Plaintiff has set forth his deductive analysis in this Complaint so that the Court may evaluate the allegations, combined with the available evidence, and draw its own conclusions. Every scrap of information the Plaintiff has obtained from Sedgwick and Budget in the past year is referenced in this Complaint. The Plaintiff is willing to reconsider his conclusions if presented with contrary evidence.

Wholesale Cars continued to sell the Toyota and posted it for sale, knowing that it was illegal to do so – it is an unlikely alliance and even less likely conspiracy.

159.    Almost all the documentation obtained by Plaintiff indicates that the Toyota was sold as a used car, needing repairs.

160.    Budget sold the Toyota, not a salvage yard, but to a car dealership for 40 times the average value of a vehicle sold as salvage because the vehicle was not salvage **economically**; **economically,** it was a used car.

161.    The vehicle is **legally** salvage in New Mexico because:

> The declaration by an insurance company that a vehicle is a salvage or non-repairable vehicle makes the vehicle a salvage vehicle or non-repairable vehicle regardless of the relative amounts of repair costs versus fair market value.

> N.M. Admin. Code 18.19.3.52.

163.    Hick's email made the Toyota a salvage and non-repairable vehicle under New Mexico law:

> Hello Jesse, as you know, **the salvage** has been sold.  **It was NOT repaired**. I have never relayed that the rental was repaired to anyone.  Per our communication, you are in possession of all the documents.  As you as [sic] know was relayed to you.  We are self-insured, which allows us to settle a claim as an **unrepairable total loss vehicle** which is not an industry total which in most cases you carrier does not honor our total loss if te estimate does not meet industry standards of what is deemed a true total.  However I can negotiate the settlement of this vehicle.  This claim has been delayed for too long now.  On June 12, I will be referring this claim over to our collection agency for nonpayment.

Attachment L. [emphasis added].

164.    Thus, Budget sold a vehicle that was legally a salvage vehicle to a used car lot as a used car without a salvage stamp.

165.        A casual observer might suggest that there is no harm, no foul, i.e., that there is no there there.

166.        Sedgwick and Budget mischaracterized the disposition of the Toyota as salvage and the claim as a total loss; when they should have recorded it as a used vehicle, needing repairs.  It would seem to be a matter for auditors, accountants, tax people, police people, not the civil Courts.

167.        This paper shuffle has consequences for the Plaintiff and members of the Classes.

168.        At bottom, Sedgwick tells the people who are buying the vehicle that the vehicle is a used car with repairable damage; whereas Sedgwick tells the Plaintiff and his insurance company that the vehicle was salvage and was not repairable. [18]

169.        In and of itself, this does not help the Plaintiff or the Classes.

170.        The only conclusion that can be drawn, thus far, is that Budget and Sedgwick lied to someone.

171.        Sedgwick might say that it told the Plaintiff the truth; Budget lied to Houston Wholesale Cars and sold a Houston a lemon; so be it.

172.        Based on a preponderance of the evidence, Sedgwick lied to Plaintiff.

173.        If Houston bought the Toyota for $29,000 and it needed $11,000 in repairs, Houston could not sell it for $38,000[19], and make money; it is not even a close call.

---

[18] The above allegation, if true, might led to criminal culpability on someone's part; the undersigned has not evaluated such conduct in context of the criminal justice system and has no business doing so.  Plaintiff's references to fraud and extortion are torts and civil causes of action that must be proven by preponderance of the evidence, not proven beyond a reasonable doubt.  Plaintiff did not apply a reasonable doubt standard in reaching his conclusions, but the Court may draw its own conclusions from the allegations and attachments; and conclude that some of them are proven beyond a reasonable doubt, though an irrelevant standard.

174.     Two of the numbers in the above numbered paragraph are not subject to

scrutiny; the wholesale price of $29,000 and corresponding retail price of $38,000 are

independently verifiable.

175.     All that remains is the Cost of Repairs.

176.     One must assume that the Toyota needed fewer repairs than Sedgwick and

Budget reported to Plaintiff and his insurance company, a lot fewer.

177.     The State of New Mexico requires insurance companies who wish to declare a

vehicle a salvage vehicle or total loss, the terms being synonymous:

> In determining whether a vehicle is a salvage vehicle, **only costs related to
> returning the vehicle to a road-worthy condition shall be included as costs of
> repairing the vehicle. Costs which are beyond those necessary to make a
> damaged vehicle safely operable on the highways, such as replacing a clear
> windshield with a tinted one or adding racing stripes, shall be excluded.**
> Payments not related to the repair of the vehicle, such as compensation for
> medical costs, car rentals, lost work time and the like, shall also be excluded. **Fair**

---

[19] This price varied based on internet archive information, as one would expect with a vehicle that
did not sell right away. It would appear that Houston Wholesale Cars ultimately sold the
vehicle at another auction. This is problematic from the investigation perspective because
Budget sold the Toyota to Houston for $29,000, wholesale, needing repairs in undetermined
amount. Houston put the Toyota on its lot for sale, after apparently spending money on
repairs, but then sold it at auction, at least in theory, to another person who has to sell the
Toyota to someone else. In other words, Houston did not sell the Toyota to an end user.
There is no profit to made from these transactions. It is like the Bottle Imp. The more times
the Toyota changes hands, the more times it must be resold to someone else; the money that it
is worth dries up. The Toyota has 48,000 miles on it. The profit from any final sale has been
consumed by churning transactions, i.e., too many middlemen. As a Fraud Examiner,
Plaintiff's attention would automatically be drawn to transactions that seem to produce no
profit. If an activity is producing no cognizable profit, at least on the surface, there must be
another reason to engage in the activity. The more people who are participating in an activity
that would seem to produce no profit, the greater the likelihood that fraud is involved.
Protocol would warrant further investigation, but Plaintiff has been investigating the case at
his own expense and can longer afford to do so. Moreover, every rock that Plaintiff turns
over seems to reveal more fraud. Given that the investigation is undefined and possibly
mammoth in scope -- and that Plaintiff's resources are depleted -- Plaintiff has closed the
investigation. In the event that more resources become available to the Plaintiff, the file can
be reopened.

**market value shall be that indicated for the make and model in the national automobile dealers association used car pricing guide, or equivalent publication, exclusive of the fair market value of accessories, such as a stereo system.**

N.M. Stat. Ann. § 66-1-4.16 (1978).

181.    In determining the Cost of Repairs, Sedgwick included items that had never been on Toyota, leave alone items that were necessary to restore it to "road-worthy condition."

181.    In determining the fair market value of the Toyota, Sedgwick included items that were accessories, and which advanced the fair market value of the Toyota.

182.    Referencing paragraph 170, Sedgwick and Budget lied to Plaintiff.

182.    **Circumstantial Evidence and Deducting Reasoning Reveal a Reason Why Sedgwick and Budget Lied to Plaintiff and by Extrapolation to Class Members.**

183.    Sedgwick and Budget should **not** have classified the Toyota as salvage or unrepairable; why does this matter?  Here is why:

184.    Sedgwick and Budget are misclassifying the Toyota as salvage, and as a total loss, in order to void a portion of the Plaintiff's insurance policy and to defraud Plaintiff through false analysis and false records.

185.    Plaintiff is informed and believed that Sedgwick and Budget have accomplished this many times.  Here is how it works:

186.    **The Auto Insurance Claims Environment Represents One in Which There are Windows for Fraud.**

186.    A total loss means the vehicle is damaged to the point where it is not worth repairing.

187.    Somone thought the Toyota was worth repairing because it has been repaired.

188.    The Toyota was worth repairing.

189.    The common algorithm in the insurance industry to determine whether a vehicle is a total loss:

Cost of Repairs Plus Salvage Value > Sales Value = Total Loss

Cost of Repairs Plus Salvage Value < Sales Value = Repairable

190.    The inequality is not a rule of accounting; it is a rule of efficiency.

191.    The inequality would dictate a decision regarding a damaged vehicle in India or Peru, in the United States, indeed anywhere a claims adjuster uses math.

192.    Plaintiff knows of no mandate requiring a claim adjuster to use the algorithm.

193.    A mandate is unnecessary; claim adjusters use the algorithm because it makes sense, not because they are required to do so.

194.    The lack of a mandate opens a window of opportunity for fraud.

195.    Hick's described Sedgwick's mode of operation:

"We are self-insured, which allows us to settle a claim as an unrepairable total loss vehicle which is not an industry total which in most cases you carrier does not honor our total loss if the estimate does not meet industry standards of what is deemed a true total."

196.    The industry standard to which Hick's is referring is the algorithm that would be true anywhere.

197.        The algorithm is the most efficient way to decide.

198.        Hicks claims that Sedgwick does not use the most efficient way in deciding.

199.        If Sedgwick has incorporated inefficiencies into its decision process, there would need be a reason for doing so, as the most efficient equation is simple and easy to apply.

200.        There is no lawful reason why Sedgwick would not use the industry standard.

201.        The reason why Sedgwick does not use the industry standards is because it would inhibit Sedgwick's ability to manipulate the numbers.  Here's why:

202.        A regular insurance company, such as GEICO, receives a claim; GEICO evaluates whether the vehicle is a total loss, i.e., not worth repairing, or is repairable, using the algorithm.

203.        If the vehicle is repairable, GEICO pays a mechanic to repair it, and sends the repair bills to all parties.

204.        If the vehicle is not economically repairable, GEICO declares it a total loss and pays the interested party the value of the car, minus the deductible; again, GEICO is a glass door of transparency; there is no reason to be otherwise because GEICO uses insurance industry standards in making its decisions.[20]

205.        Because Sedgwick does not use industry standards and because it shields its activity in a veil of false analysis and documentation, it can classify any vehicle as a total loss, i.e., unrepairable, even if the damage is only a scratch in the fender or a nick in the windscreen.

_____

[20] After releasing all the documentation regarding the claim, GEICO entertains arguments as to the value of the vehicle and is amenable to persuasion.  The undersigned Plaintiff is familiar with GEICO both as a customer and as a private attorney representing customers who had claims handled by GEICO.

206.    Somewhere between the Budget parking lot, the auction house and the car

dealership, the vehicle miraculously got repaired, and no one wants to take credit for it.

207.    The problem with windows of fraud in a system is that people are always

climbing through them.

**208.    Sedgwick and Budget Wove a Scheme to Defraud Plaintiff and Others by
Manipulating the Numbers.**

**209.    Scheme Part A: Sedgwick and Budget Deprive the Plaintiff of
Documentation.**

210.    First, Sedgwick illegally classifies the vehicle as a total loss, i.e., an unrepairable

or salvage vehicle.

211.    By doing so, Sedgwick deprives the Plaintiff of hard receipts that would have

given the Plaintiff leverage against his insurance company or Sedgwick.

212.    For example, when resolving a claim, if a vehicle is economically repairable,

GEICO repairs it and sends the repair bill to the interested party.

213.    Budget, through Sedgwick, can declare any vehicle a total loss at any time and for

any reason.

214.    If the vehicle is damaged, even slightly, Budget can sell the vehicle as a used

vehicle thus shifting the Cost of Repairs to someone else and leaving the party

responsible for damage adrift, without information, documentation or anything else of

legitimacy to submit to the insurance company.

215.        Plaintiff has only documents produced by Budget and Sedgwick to submit to his

insurance company.

216.        **Scheme Part B: Sedgwick and Budget Target an Exclusion in Plaintiff's**

**Insurance Policy with Pinpoint Accuracy.**

217.        Classifying the Toyota as a total loss, when it was economically repairable, has

deprived the Plaintiff of full coverage for the accident:  Here is how:

218.         Many insurance companies define the way they award damages in the lesser of

two manners:

>        (a) The cost of repairs and rental charges imposed by the rental company

>              while the vehicle is being repaired (i.e., "loss of use" charges) or

>        (b) The ACTUAL CASH VALUE of the vehicle.

AIG/Travel Guard Policy [emphasis in original].

219.        Again, by depriving the Plaintiff of any receipts for damages, Sedgwick had

reduced the entire claim from one of hard receipts, such repair bills, rental charges, etc.,

to the vehicle's ACTUAL CASH VALUE or estimates of what the vehicle would have

been worth or what repairs would have cost, the realm of speculation, conjecture and

expert witness analysis -- notably Sedgwick's own expert analysis.

220.        The Plaintiff remains on the hook for the "loss of use" hard damages in

subparagraph (a).

221.        "Loss of use" damages are common in the insurance industry; Plaintiff wrecked

the Toyota, which needed repair, and Budget is entitled damages for the loss of use of the

vehicle while it being repaired; these are legitimate damages.

222.  "Loss of use" damages sometime exceed all other damages in a case.

223.  "Loss of use" damages are relevant to the Plaintiff's standing because "loss of use" damages, **in this case**, represent fraud against the Plaintiff and Class members. Here is how:

224.  If the vehicle had **not** been declared a total loss, all the costs in subparagraph (a) would have been covered by insurance, and there would have been no costs associated with subparagraph (b) because that subparagraph would have become irrelevant.

225.  Sedgwick classifies the vehicle (Toyota) as a total loss, thus forcing the insurance carrier (AIG) to resolve the claim as ACTUAL CASH VALUE.

226.  By forcing the insurance company (AIG) to default to subparagraph (b), Sedgwick implicates both paragraphs of the damages clause; AIG pays the ACTUAL CASH VALUE of the vehicle, which is offset by not paying for Cost of Repairs; but the "loss of use" damages remain outstanding.

227.  Disguising Cost of Repairs as loss in ACTUAL CASH VALUE is fraud because it voids part of the Plaintiff's insurance policy, specifically the provision that would have covered the Plaintiff for "loss of use" damages.

228.  **Scheme Part C: Sedgwick and Budget Dispose of Plaintiff and Plaintiff's Claim as Collateral Damage in Sedgwick and Budget's Grander Scheme of Fraud.**

229.  The other reason why Sedgwick would not use the algorithm.

Cost of Repairs Plus Salvage Value > Sales Value = Total Loss

Cost of Repairs Plus Salvage Value < Sales Value = Repairable

is because, based on the algorithm, Sedgwick's documentation will not hold up to scrutiny and does not make sense.

230.    Thus, to exacerbate the fraud committed already, Sedgwick inflated both the Sales Value of the Toyota and the Cost of Repairs, through doctored and fraudulent documents.

231.    There is a reason for doing do so.  Again, the industry algorithm:

$$\textbf{Cost of Repairs} \text{ Plus } \textbf{Salvage Value} > \textbf{Sales Value} = \text{Total Loss}$$

$$\textbf{Cost of Repairs} \text{ Plus } \textbf{Salvage Value} < \textbf{Sales Value} = \text{Repairable}$$

has three variables.

232.    Sedgwick cannot change the industry standard or the standard by which others may look at what it has done.

233.    Once, the claim administrator (Hicks) has declared a vehicle a total loss or unrepairable, that vehicle must bear a salvage stamp on the title and cannot be resold -- except to a junk yard for dismantling -- and cannot be driven on public roadways.

234.    The Salvage Value in Sedgwick's inequality represents fraud because it represents the sale of the vehicle, without a salvage title, to a used car lot, after a declaration of total loss.

235.    Based on the fraud, Budget sold the Toyota for 40 times the average price of a vehicle sold as salvage because it sold the Toyota without a salvage stamp.[21]

236.    Sedgwick cannot change the Salvage Value because there is a receipt for the Bill of Sale which represents an exchange between Budget and someone else.

---

[21] The salvage value of a vehicle is often so low, the company owning it will keep it until it depreciates to zero book value; the tax benefit being worth more than the salvage value.

237.     Because the inequality has one variable that is 40 times larger than it should be, and that is the one variable that Sedgwick cannot change, Sedgwick must adjust **all** the other variables for the inequality to not look ridiculously lopsided to draw the attention of auditors, investigators, etc.[22]

238.     In other words, Sedgwick and Budget must inflate Cost of Repairs and inflate Sales Value to conceal the fraud that would otherwise be obvious from the ridiculously high Salvage Value and to make the inequality look legitimate.

239.     Thus, in order to conceal frauds that Sedgwick and Budget are committing against the State of New Mexico and prospective buyers, Sedgwick and Budget are defrauding the Plaintiff and his insurance carrier as well.  Here is how:

240.     Sedgwick has inflated the estimated Sales Value of the Toyota to the point where the Toyota would be a total loss no matter what the other variables are because Sedgwick claims that the Toyota with forty-thousand miles on it would sell for more than the MSRP, a Paradox of Zeno; all the other variables are essentially meaningless.[23]  Exhibit S.

241.     In other words, Sedgwick contends the Toyota is worth more now than it was new.

242.     Like Zeno, one wonders if Sedgwick believes anything it says, and like Zeno, Sedgwick's rationale is sophistry disguised as something more rational.

---

[22] The function is an inequality and as such will rarely balance, but auditors would still examine the underlying inputs, if Sedgwick's function looks radically different from everyone else's.

[23]

243.    Sedgwick has inflated the estimated Cost of Repairs by adding damage to the car that did not result from the accident.

244.    If Sedgwick used this doctored documentation to inflate a claim against another insurance carrier, such as AIG, there will be a fight over how much everything really costs.

245.    Hicks admitted in his email:

> "We are self-insured, which allows us to settle a claim as an unrepairable total loss vehicle **which is not an industry total which in most cases you carrier does not honor our total loss if the estimate does not meet industry standards of what is deemed a true total."**

246.    Hicks does not want that fight on his hands; but dealing with Plaintiff, who is not a multinational corporation, is a different matter altogether.

247.    AIG might ask for receipts or ask why the vehicle sold as salvage to a used car lot for 40 times the average amount of salvage values.[24]

248.    If the Plaintiff has insurance to cover the accident, Sedgwick has no recourse other than to negotiate with AIG, the insurance carrier – therein lies the dilemma.

249.    Arguendo, if the vehicle **were** a total loss, Sedgwick would get only $675 or reasonably near the price for unrepaired vehicles, plus AIG's $10,000 settlement[25], plus whatever Sedgwick can extract from the Plaintiff.

---

[24] Why AIG Travel Guard did not ask these questions remains a mystery.

[25] Why AIG Travel Guard would pay Sedgwick anything remains a mystery.  The Plaintiff has suspicions as to AIG's motives but lacks a sufficient factual basis to include AIG Travel Guard as a named defendant.

250.    Arguendo, there is no way Sedgwick can make money for itself and for Budget, if

it settles the entire claim for $10,675, plus whatever Sedgwick can extract from the

Plaintiff.

251.    With AIG's proposed settlement and according to Sedgwick's own

documentation, Sedgwick will have recovered the full amount of its own inflated value

for the vehicle and more than the manufacturer's suggested retail price on the Toyota.

| | |
|---|---|
| Salvage Value | = $29,000.00 |
| AIG Settlement | +$10,000.00 |
| **Total Revenue** | **=$39,000.00** |
| Sedgwick Estimate Value for the Vehicle: | =38,000.00 |
| MSRP on the Toyota | =$36,900.00, |
| Attachment S. | |

252.    Sedgwick and Budget will have recovered the full amount of the Toyota's value,

and the Plaintiff remains on the hook for whatever money Sedgwick can extort from the

Plaintiff.

253.    Sedgwick has leverage in its campaign against the Plaintiff, legitimate leverage,

the "loss of use" damages.

254.    Unlike Sedgwick's estimates, "loss of use" damages are hard damages, i.e.,

receipt damages; they are, for all practical purposes, irrefutable.

255.    Sedgwick's and Budget's lies about the Cost of Repairs, about the Sales Value,

about the Toyota being a total loss and about having scrapped the Toyota increased

Sedgwick and Budget's profit on the transaction at the Plaintiff's expense; thus, the lies are fraud.

256.    Specifically, the fraud committed against the Plaintiff and each Class member is the loss of insurance coverage for "loss of use" damages, and the inflated estimated Costs of Repair and Sales Value.

257.    The remainder of the damage calculation, Cost of Repairs and Sales Value, is based on Sedgwick's own estimates, not actual damages, and ultimately is subject to Sedgwick's faulty algebra and other mathematical inequalities of fraud and extortion.


**Denouement**

258.    Budget's claim against Plaintiff is not far removed from that which Plaintiff anticipated he would pay out-of-pocket in the wake of the accident; it is within the realm of what Plaintiff might have been willing to pay.

259.    Sedgwick's continued secrecy, obstinance and refusal to provide documentation prompted Plaintiff to open an investigative file on his own case, a decision that in hindsight may have been unwise.

260.    Plaintiff acknowledges that neither Sedgwick nor Budget asked Plaintiff to investigate anything; but the investigation took a toll on Plaintiff's business, in an amount greater than the amount in dispute.

261.    Notwithstanding Plaintiff's voluntary expenditures on the investigation, Plaintiff acknowledges that the Toyota may have suffered a loss in Sales Value as a result of the

accident, independent of Cost of Repairs, i.e., the Toyota has lost value based on **the fact** of an accident, even if the Toyota has been repaired.

262.    When Plaintiff can determine the loss in Sales Value, Plaintiff will write Budget a check drawn on Plaintiff's personal account to cover the damages.

263.    Until the time when Plaintiff knows his debt, to the penny, Plaintiff will pay nothing and will refuse to release the insurance proceeds.

264.    Plaintiff's **other claims** for damages, **based on fraud**, and on behalf of the Classes, **are not** part of this equation.

265.    Plaintiff's clumsy and unfocused investigative activities, like those of a bull stumbling in the dark,[26] knocked over a lantern.

266.    The resulting conflagration led Plaintiff to his current untenable situation.[27]

267.    Even if Plaintiff wanted to cut his losses and go home, he cannot.

268.    There are outstanding compensatory damages, the vast majority of which (99%) do not belong to Plaintiff.

---

[26] Though loath to admit it, Plaintiff acknowledges that this characterizes Plaintiff's investigative method in any case, sometimes producing dismay and resentment of the part of Plaintiff's clients. Plaintiff's refuses to accept a hypothesis, at any time, during an investigation. While this may not appear to be a protocol of any great design, it is Plaintiff's only protocol. Plaintiff used no hypotheses in this case and has none as of this writing. A hypothesis is different from a conclusion. Plaintiff has reached numerous conclusions, but none was used to confirm a hypothesis.

[27] Curiosity Killed the Cat, a simple cautionary tale that has complexities and permutations, Plaintiff can never seem to fathom.

269.    As it is not Plaintiff's money, it is not Plaintiff's decision.

270.    The ominous threat of a salvage stamp will follow the vehicle's title until the end of time, like a wine stain searching for a white blouse; every hand the title touches will be the hand of a fraud victim.

271.    One cannot but wonder how many of Budget's "total losses" are traversing the highways and byways of our nation; vehicles, which according to the State of New Mexico, are: "unfit or unsafe to be operated or moved upon the highways."[28]

272.    At bottom, the fraud that Budget and Sedgwick are committing against the Plaintiff and the named Classes may be the tip of an iceberg of other torts Budget and Sedgwick are committing against other people: document venders, auction sites, car salespeople, unsuspecting car buyers, lenders who relied upon the titles as collateral, state authorities, repo men, hitchhikers, parking valets, pedestrians, car thieves, etc.

273.    The fraud committed against the Plaintiff, his insurance company and the Classes would appear part of the cover-up, not the main fraud.

274.    The possibility of these extraneous torts and pool of potential other unrepresented victims is not a basis for this lawsuit, but it was a basis upon which the Plaintiff decided to pursue this lawsuit.

275.    Plaintiff wanted to determine how much money Plaintiff owed Budget, but "walking away" from the ensuing investigation gradually disappeared as an option for

---

[28] The City of Albuquerque may be the perfect place to commit such a crime. Budget's "total losses" would hardly be distinguishable from the many of the other cars, hiding in plain sight.

the Plaintiff, ultimately vanishing: a Rubicon Plaintiff knew, and knows, he will bitterly

rue; but one from which he saw no other course.

276.　　The Plaintiff lacks standing to represent most of these other victims.

277.　　The tip of an iceberg is room enough, however, that one, among many,

may find purchase.

## SECOND CAUSE OF ACTION

### (Tort: Extortion)

278.　　Plaintiff re-alleges and incorporates by reference the allegations contained in the

entirety of this Complaint as if fully set forth herein.

279.　　The Second Cause of Action is directed against Defendant Sedgwick only.

280.　　In New Mexico:

> Extortion consists of the communication or transmission of any threat to
> another by any means whatsoever with intent thereby to wrongfully
> obtain anything of value or to wrongfully compell [compel] the person
> threatened to do or refrain from doing any act against his will.

> Any of the following acts shall be sufficient to constitute a threat under
>    this section:

> A. a threat to do an unlawful injury to the person or property of the
>    person threatened or of another;

> B. a threat to accuse the person threatened, or another, of any crime;

> C. a threat to expose, or impute to the person threatened, or another, any
>    deformity or disgrace;

    D.  a threat to expose any secret affecting the person threatened, or another; or

    E.  a threat to kidnap the person threatened or another.

Whoever commits extortion is guilty of a third degree felony.

N.M. Stat. Ann. § 30-16-9.

281.      Sedgwick's letter dated March 10, 2023, Attachment F, and email dated May 31, 2023, Attachment L, constitute extortion.

282.      Sedgwick threatened to report Plaintiff to a collection agency; thus, threatening a direct injury to Plaintiff, Plaintiff's property, Plaintiff's financial status, Plaintiff's reputation and Plaintiff's ability to earn a livelihood:

Hello Jesse, as you know, **the salvage has been sold.  It was NOT repaired.**  I have never relayed that the rental was repaired to anyone.  Per our communication, you are in possession of all the documents.  As you as [sic] know and was relayed to you.  We are self-insured which allows us to settle a claim as an unrepairable total loss vehicle which is not an industry total which in most cases you carrier does not honor our total loss if the estimate does not meet industry standards of what is deemed a true total.  However I can negotiate the settlement of this vehicle.  This claim has been delayed for too long now.  On June 12, **I will be referring this claim over to our collection agency for nonpayment.**

Attachment L [emphasis added].

283.      It was the second such communique Plaintiff received from Sedgwick. Attachment F.

284.      Sedgwick seeking to extort money from Plaintiff without due process.

285.     Hypothetically, Sedgwick could demand any sum of money from the Plaintiff-$10,000,000,000.00 or more --without supporting documentation -- and threaten to report Plaintiff to a collection agency, notably Sedgwick's own collection agency.

286.     The Plaintiff is liable for the accident, but the Plaintiff does not yet owe Budget a determined amount of money, especially any sum of money that Budget demands.

287.     If Plaintiff does not meet Sedgwick's demands -- no matter what those demands are or how often they change -- Sedgwick will destroy Plaintiff's credit and subject Plaintiff to harassment from collection bureaus.

288.     Sedgwick's actions, as evidenced by Hicks' letter and email, constitute extortion.

## THIRD CAUSE OF ACTION

### (Tort: Interference with Contractual Relationship)

289.     Plaintiff re-alleges and incorporates by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

290.     The Third Cause of Action is directed against both Defendants.

291.     In New Mexico, a plaintiff alleging tortious interference with contract may show that Defendant destroyed a contractual relationship, and that the defendant had an improper motive or used an improper means.  *Kelly v. St. Vincent Hosp.*, 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct. App. 1984).

292.     Plaintiff entered into a contract with AIG Travel Guard for insurance in the event of an accident.  Attachment A.

293.     By classifying all of the damage from the vehicle as a loss in value, Budget and Sedgwick destroyed Plaintiff's ability to enforce the contract.

294.     Sedgwick and Budget had an improper motive in that Sedgwick and Budget

wanted to extort money from the Plaintiff after having been paid in full.

295.     Sedgwick and Budget used improper means, i.e., the doctored documentation, to

accomplish its purpose of destroying Plaintiff's contractual relationship with AIG Travel

Guard.

296.     The improper motive need not be Sedgwick's only motive. *Fikes v. Furst*, 134

N.M. 81 P.3d 545 (2003).

## FOURTH CAUSE OF ACTION

### (Intentional Misrepresentation of Fact)

297.     Plaintiff re-alleges and incorporates by reference the allegations contained in the

entirety of this Complaint as if fully set forth herein.

298.     The Fourth Cause of Action is brought against both Defendants.

299.     The foregoing facts and allegations are dispositive of numerous falsehoods

Sedgwick and Budget have uttered in their documents and communications.

300.     Sedgwick and Budget lied about the disposition of the vehicle.

## FIFTH CAUSE OF ACTION

### (Violation of the Fair Debt Collections Practice Act: 15 U.S.C. § 1692)

301.     Plaintiff re-alleges and incorporates by reference the allegations contained in the

entirety of this Complaint as if fully set forth herein.

302.    The Fifth Cause of Action is brought against Sedgwick only.[29]

303.    The Fair Debt Collection Practices Act prohibits:

False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

  ***

(2) The false representation of –

  (A)  the character, amount, or legal status of any debt; or . . . .

***

  (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

****

  (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. § 1692

304.    Hicks' email of May 31, 2023:

---

[29] Plaintiff acknowledges that Sedgwick's attorney verbally assured Plaintiff that Sedgwick would not pursue collection activities against the Plaintiff, until a court order was entered. However, even if this is the case, Plaintiff's claim is not moot because the violation of the act occurred when the extortion letter was sent.  Subsequent remedial measures are damage mitigation, not liability eliminators.

Hello Jesse, as you know, **the salvage has been sold.  It was NOT repaired.  I have never relayed that the rental was repaired to anyone.** Per our communication, you are in possession of all the documents.  As you as [sic] know was relayed to you.  **We are self-insured, which allows us to settle a claim as an unrepairable total loss vehicle** which is not an industry total which in most cases you carrier does not honor our total loss if the estimate does not meet industry standards of what is deemed a true total.  However I can negotiate the settlement of this vehicle.  This claim has been delayed for too long now.  On June 12, I will be referring this claim over to our collection agency for nonpayment.

Attachment L [emphasis added].

305.    The vehicle was not sold as salvage.

306.    The vehicle was not an unrepairable total loss because someone, e.g., Sedgwick, repaired the vehicle and sold it, as repaired.

307.    Sedgwick's communication to both Plaintiff and Plaintiff's insurance carrier AIG (Mays) misrepresents the character, amount and legal status of any debt.

308.    Sedgwick's communication to both Plaintiff and Plaintiff's insurance carrier AIG (Mays) is threatening to report Plaintiff to a collection agency based on information Sedgwick knows to be false.

309.    Sedgwick is using false and deceptive means to collect a debt.

310.    Sedgwicks' actions are in violation of the Fair Debt Collection Practices Act.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

311.    Plaintiff re-alleges and incorporates by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

312.    The Sixth Cause of Action is brought against both Defendants.

313.    Sedgwick handles claims for Budget in exchange for some kind of compensation paid to Sedgwick by Budget.

314.    The money obtained by the numerous falsehoods and resulting proceeds set forth in this complaint represents unjust enrichment on the part of Sedgwick and Budget.

315.    Sedgwick would get more than its commission and Budget would get more than the car was worth.

## SEVENTH CAUSE OF ACTION

### (Injunctive Relief)

316.    Plaintiff re-alleges and incorporates by reference the allegations contained in the entirety of this Complaint as if fully set forth herein.

317.    The Seventh Cause of Action is brought against both Defendants.

318.    Federal Rule of Civil Procedure 65:

(a) Preliminary Injunction.

(1) Notice. The court may issue a preliminary injunction only on notice to the adverse party.

(2) Consolidating the Hearing with the Trial on the Merits. Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not

ordered, evidence that is received on the motion and that would
be admissible at trial becomes part of the trial record and need
not be repeated at trial. But the court must preserve any party's
right to a jury trial.

Federal Rule Civ. P. 65.

319.     Rule 65 is a procedural rule, rather than a substantive rule of law, or a particular

cause of action; it applies to a wide variety of litigation situations. *Torres v. First State*

*Bank*, 588 F.2d 1322 (10th Cir. 1978).

320.     Plaintiff requests on behalf of the Classes that the Court enjoin Sedgwick and

Budget from classifying vehicles as total losses and then selling them without salvage

stamps on the title.

321.     Plaintiff further requests on behalf of himself and the Classes the Court enjoin

Sedgwick from threatening people with collection activities prior to a finding by a Court

or Arbitrator of damages.[30]

322.     The Plaintiff is asking the Court to enjoin the Defendants from ongoing criminal

conduct.

---

[30] Plaintiff acknowledges, again, that Sedgwick's attorney verbally assured Plaintiff that
Sedgwick would not pursue collection activities against Plaintiff.  Plaintiff's request for
equitable relief is not, however, moot.  Sedgwick's attorney may not be able to prevent
Sedgwick from pursuing collection activities against the Plaintiff.   He works for them, not
the other way around.  Moreover, the Plaintiff seeks prospective relief on behalf of the
Classes.  If Sedgwick has no intention of pursuing such collection activities, Sedgwick should
have no objection to the entry of a preliminary injunction.   The order would only preclude
Sedgwick from doing that which it says it will not do.

323.    The appropriateness of injunctive relief is determined through a four-part test. Under this test, the "Plaintiff must show that 1) the Plaintiff will suffer irreparable injury unless the injunction is granted; 2) the threatened injury outweighs any damage the injunction might cause the Defendant; 3) issuance of the injunctive relief will not be adverse to the public's interest; and 4) there is a substantial likelihood Plaintiff will prevail on the merits." *LaBalbo v. Hymes*, 115 N.M. 314, 850 P.2d 1017 (Ct. App. 1993) (citations omitted).  Plaintiff meets each of these four requirements.

324.    The destruction of one's credit and harassment by credit bureaus are harms that cannot be compensated by a pecuniary standard.  *See State ex rel. State Highway & Transp. Dept. Of N.M. v. City of Sunland Park,* 129 N.M. 151, 3 P.3d 128, 157 (N.M. Ct. App. 2000) (citation omitted).

325.    Neither monetary relief nor any other legal remedy can redress the harm that Plaintiff will suffer from having his credit destroyed and from harassment by collection agencies over an amount of money that is disputed.

326.    The threatened injury to the Plaintiff is that Plaintiff will be subjected to further crimes at the hands of the Defendants and such harms would irreparable under New Mexico law.  *See Amkco, Ltd., Co. v. Welborn,* 130 N.M. 155,159, 21 P.3d 24 (N.M. 2001) (citation omitted).

327.    The burden on the Defendants in this case is slight, as they should not engage in criminal conduct.

328.    The only other burden to the Defendants is they may have to report the disposition of vehicles accurately in order to resolve claims -- at most, a business inconvenience.

329.     The financial and reputation threat facing the Plaintiff far outweighs the operational and financial issue facing the Defendants.

330.     It would advance the public interest for the Defendants to cease engaging in tortious and criminal conduct.

331.     Injunctive relief would advance the public interest by upholding relevant law.

332.     There is a strong possibility that the Court will conclude that the Defendants must follow some lawful procedures in resolving the claim against the Plaintiff.

333.     Therefore, the likelihood of the Plaintiff prevailing on the merits of this Petition/Complaint is high.

## CLASS ALLEGATIONS

334.     Plaintiff brings this class action on behalf of himself individually and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

   a.  Nationwide Fraud Class:  The nationwide fraud class consists of all similarly situated parties in the past five years against whom Sedgwick pursued a claim on Budget's behalf, and during which pursuit: Sedgwick declared the vehicle an unrepairable total loss while Budget contemporaneously resold the vehicle at an illegal profit for both Budget and Sedgwick:

      i.  Fraud Subclass A:  The nationwide fraud subclass A consists of all similarly situated parties during the last five years against whom Sedgwick pursued a claim and during which pursuit: Sedgwick declared the vehicle in question a total loss but in which neither Sedgwick nor Budget can produce a title with a salvage mark that was filed prior to August 0f 2023.

ii. Fraud Subclass B: The nationwide fraud subclass B consists of all similarly situated parties during the last five years against whom Sedgwick as a total loss for insurance purposes and in which the salvage value of the vehicle, or the documented price for which it sold, exceeded the average salvage value of a vehicle -- $675.00 -- by two standard deviations, or approximately $700.00.[31]

335.     Plaintiff reserves the right to amend the Fraud Class definitions if discovery and further investigation reveal that the Classes should be expanded or otherwise modified.[32]

336.     Nationwide Extortion Class: The nationwide extortion class consists of all similarly situated parties in the past five years against whom Sedgwick pursued a claim; and during which pursuit Sedgwick reported the party to collection agencies – prelitigation – **and** those parties who were threatened with collection activities, prior to a finding by any court, or arbitrator, of damages, specifically all parties who have received a letter similar to the letter that is Attachment F, letter containing the language, "we may

---

[31] If the alleged salvage value of the vehicles exceeded the average salvage value by two standard deviations, it would indicate that the vehicle sold without a salvage title **or** was not a true total and was sold as a used vehicle. The Plaintiff acknowledges that the math behind this number is imprecise because the sample size is unknown. The Plaintiff has assumed a sample size of 150. The Plaintiff has presumed a mean of $675 and a standard bell-shaped distribution. The standard deviation of the sampling distribution should decrease as the size of the samples that were used to calculate the mean for the distribution increases. The Plaintiff is not a mathematician. Plaintiff apologizes for any mathematical errors. The Plaintiff's request and arbitrary value are based as much on common sense as they are based on theoretical mathematics. If Defendants submit a different calculation for the standard deviation, they may well be correct.

[32] An obvious Fraud Class would consist of people who bought vehicles from Budget thinking the titles were clean, i.e., that the vehicles were either used fleet vehicles or repaired vehicles, not salvage vehicles that could not be resold. The undersigned Plaintiff lacks standing to represent those individuals.

refer your file to a collection agency or attorney for collection efforts or consideration of suit."

337.     Plaintiff reserves the right to amend the Extortion Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

338.     Nationwide Deceptive Practices Class: The nationwide deceptive practices class consists of all similarly situated parties in the past five years against whom Sedgwick pursued a claim; and during which pursuit, Sedgwick used false documentation to justify either the damage assessment or the market value of the vehicle, e.g., listing items as damaged when the vehicle never had the item, listing items as damaged when the item was not damaged in the accident or using a single auto listing as a metric by which fair market values are established.

339.     This action is properly brought as a class action under Federal Rule of Civil Procedure 23(a) for the following reasons:

### Numerosity (Fed. R. Civ. P. 23(a)(1)):

340.     Sedgwick's and Budget's actions in this case are not exclusive to the case.

341.     The paperwork representing estimated repairs, or actual repairs, to the vehicle would have been significant and not subject to mere oversight.

342.     Selling a vehicle that has been labeled a total loss without a salvage title would not have been a mere oversight.

343.     The use of doctored documentation to facilitate fraud would seem beyond the scope of a single administrator.

344.     A single claims administrator, such as Keith Hicks, could not have perpetrated frauds on a regular basis without attracting the notice of his superiors, colleagues, auditors, accountants and other interested parties, unless Hicks was following corporate policy.

345.     Hicks would have no personal motivation to commit fraud absent a corporate motive.

346.     If recording claims as total losses before repairing the vehicles for resale is a corporate practice, more than the Plaintiff has fallen prey to this fraudulent tactic.

347.     Sedgwick is an international company handling thousands of claims each year.

348.     The Plaintiff is informed and believes the Nationwide Fraud Class is so numerous and geographically dispersed throughout the United States that the joinder of all class members is impracticable.

349.     Sedgwick uses extortion language as boilerplate in its demand letters.[33]

350.     As the extortion language is boilerplate, Sedgwick has sent similar letters to more than one person.

351.     The Plaintiff is informed and believes the Nationwide Extortion Class is so numerous and geographically dispersed throughout the United States that the joinder of all class members is impracticable.

352.     Sedgwick and Budget's use of doctored and false documentation to support its claims appears a well-practiced routine, which, at a minimum, would require knowledge

---

[33] A cost-savings and efficiency move, perhaps.

and cooperation from more than one person, and more than one person working together would indicate something that happened on more than one occasion.

353.     Upon information and belief, the Nationwide Deceptive Practices Class is so numerous and geographically dispersed throughout the United States that the joinder of all class members is impracticable.

354.     While Plaintiff does not know the exact number and identity of the Nationwide Fraud, Extortion and Deceptive Practices Classes, Plaintiff is informed and believes that there are more than 100 class members in each class. The precise number of class members may be ascertained through discovery.

**Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):**

355.     There are questions of law and fact common to the proposed classes which predominate over any questions that may affect particular class members.

356.     Such common questions of law and fact include, but are not limited to:

    a.  Whether Sedgwick and Budget falsely report claims as total losses and lied about selling the vehicles for scrap when the vehicles were sold without salvage titles.

    b.  Whether Sedgwick used false documentation to inflate repairs and market values.

    c.  Whether Sedgwick extorted money from parties who had been involved in an auto accident through collection activities prior to any finding of liability or damages.

d.  Whether Sedgwick and Budget fraudulently inflated costs and values in order to record the damaged vehicle as total loss, thus voiding a Party's insurance policy.

e.  Whether Sedgwick and Budget fraudulently increased the cost of selling and repairing a vehicle after the vehicle had been sold.

f.  Whether Sedgwick and Budget intentionally misrepresented the value of the damaged vehicle and/or made any other material misreprentations in pursuing damages for the vehicle.

g.  Whether Sedgwick pursued money from a Party, knowing that insurance and the alleged salvage value paid for more than the vehicle was worth.

h.  Whether Sedgwick and Budget acted in bad faith.

i.  Whether the Sedgwick and Budget unjustly received funds from the Fraud, Extortion and Deceptive Practices Classes.

j.  Whether Plaintiff and the Classes have been harmed and the proper measure of relief.

k.  Whether Plaintiff and the Classes are entitled to an award of punitive damages, attorneys' fees and expenses against Sedgwick and Budget.

l.  Whether, because of Sedgwick and Budget's misconduct, Plaintiff and the Classes are entitled to equitable relief, and if so, the nature of such relief.

**Typicality (Fed. R. Civ. P. 23(a)(3)):**

357.    Plaintiff's claims are typical of the claims of the Extortion, Fraud and Deceptive

Practices Classes, and the Classes have been injured by the same wrongful practices of

Sedgwick.

358.    Plaintiff's claims arise from the same practices and conduct that give rise to the

claims of the Classes and are based on the same legal theories.

**Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):**

359.    The Plaintiff will fairly and adequately protect the interests of the Classes as he

has no interests antagonistic to those of the other members of the Classes.

360.    This Court retains ample power pursuant to Fed. R. Civ. P. 23(e) to police any

conflicts of interest that arise between the Plaintiff, as Class Counsel, and other Class

members.

361.    Plaintiff is an attorney with 27 years of experience.

362.    Plaintiff was Lead Articles/Survey Editor on the New Mexico Law Review.

363.    During his 2L year, Plaintiff clerked at the Office of the New Mexico Attorney

General, completing two rotations: one in criminal appeals and a second in consumer

fraud.

364.    Plaintiff won his first trial, against the Second Judicial District Attorney's Office, while Plaintiff was a third-year law student (3L).[34] [35]

365.    Plaintiff won seven cases in total against the Second Judicial District Attorney's Office during Plaintiff's third year in law school; Plaintiff lost no cases that year, and not one of Plaintiff's clients entered a guilty plea.[36]

366.    Plaintiff is a licensed attorney in the State Courts of New Mexico, the United States District Court for New Mexico, the Tenth Circuit Court of Appeals and the Second Circuit Court of Appeals.

367.    Plaintiff worked in civil litigation for five years and specialized in civil rights litigation pursuant to 28 U.S.C. § 1983.

368.    Plaintiff engaged in Section 1983 litigation representing both plaintiffs and defendants and in both state and federal court.[37]

---

[34] New Mexico allows students at the University of New Mexico to practice law under supervision, as a means of training and producing attorneys in a state with very low wages; the objective ostensibly being to integrate the process so that the student's transition from student to attorney is unmarred by major and abrupt changes, and the "new" attorney is fully indoctrinated in the judicial system – the New Mexico judicial system. Such a paradigm, by virtue of what it is, would not work in many other places.

[35] This was a trial on the merits: The defendant entered his former abode to retrieve items and was charged with criminal trespass. Plaintiff (as defense counsel) convinced the Court that defendant had not been lawfully evicted from the residence and thus could not be guilty of trespass.

[36] Plaintiff acknowledges that all third-year law students at the University of New Mexico carried relatively heavy caseloads in state court, and elsewhere, during the time Plaintiff attended. While Plaintiff's record was, at least in Plaintiff's view, exemplary, it does not represent an outlier. Plaintiff was chosen at random to do criminal work, but did also divorces, wills, etc.

[37] Plaintiff subspecialized in immunity defenses, including qualified immunity. Plaintiff attended multiple seminars in places other than New Mexico which were devoted to the analysis and explanation of these defenses. Plaintiff also subspecialized in jurisdictional issues between the state and federal systems. One of Plaintiff's primary roles in private practice was to determine how immunity defenses would differ in different forums and help clients choose which forum was more appropriate. As such, Plaintiff worked on issues of removal, remand, etc. Immunity defenses as they relate to the State of

369.    Plaintiff handled insurance claims brought against the State of New Mexico and other governmental entities.

370.    Plaintiff was counsel, or co-counsel, in six civil or administrative trials in the state courts of New Mexico.

371.    All resulted in defense verdicts, save one that resulted in a comparative fault equation that was a de facto defense victory.

372.    Plaintiff worked for the United States Department of Justice as a federal prosecutor for twenty years.

373.    As a federal prosecutor, Plaintiff handled complex litigation.

374.    Plaintiff tried 40 federal felony jury trials in the District of New Mexico, obtaining guilty verdicts in 36 of the 40 trials.[38]

375.    Plaintiff was counsel of record in more than 200 appeals, both civil and criminal, both topside and bottom side, before the United States Tenth Circuit Court of Appeals and the United States Second Circuit Court of Appeals.

376.    Plaintiff was counsel of record in more than 400 cases before the Tenth Circuit Court of Appeals, including prisoner petitions and other motions.

377.    Plaintiff presented oral argument to the Tenth Circuit Court of Appeals on more than 80 occasions.

378.    Plaintiff's success in the appellate arenas was greater than 90%.[39]

---

New Mexico can become complicated due to the, sometimes, competing sovereigns, differing spheres of jurisdiction and different bodies of law that surround each system, thus requiring a specialist. Perhaps, these were only complicated defenses to the Plaintiff. Nonetheless, Plaintiff did work for the State of New Mexico.

[38] Some of these trials involved multiple defendants and multiple guilty verdicts. Sometimes, although rarely, there was a split verdict. Including split verdicts, the Plaintiff obtained eight acquittals in total on any count of any indictment during in his twenty years of service.

379.     In 2013, the Attorney General appointed Plaintiff as a special prosecutor to the District of Colorado.

380.     In the summer of 2013, before a jury in Denver, Plaintiff convicted three prison inmates of raping another prison inmate, as part of a systematic campaign of terror in the prison. [40]

381.     Plaintiff tried two other felony jury trials in the District of New Mexico the same year.

382.     Plaintiff received the United States Attorney's Award in 2013.[41]

383.     Plaintiff handled two capital cases while serving as a prosecutor.[42]

384.     Plaintiff investigated and prosecuted all manner of criminal activity, including violent crime: Plaintiff dismantled and prosecuted the San Jose Street Gang, which committed more than 17 armed robberies in the City of Albuquerque.

385.     Plaintiff prosecuted narcotics, immigration, and corporate fraud.  Plaintiff handled fraud cases with losses in excess of $500,000.

386.     Plaintiff, along with many other prosecutors, handled cases involving firearms.

387.     Plaintiff handled alien smuggling cases for the Albuquerque office, many of which involved organized crime.  Among other operations, Plaintiff orchestrated, with

---

[39] Approximately 93%.  Plaintiff has estimated 90% conservatively.

[40] The United States Attorney's Office for the District of Colorado recused itself from the case because the victim was a bank robber that office had prosecuted.

[41] A second chair prosecutor was appointed to the Colorado case after motions but before trial and received also the United States Attorney Award.  .

[42] The Department did not seek the death penalty in these cases, but the death penalty protocol remains the same; plaintiff was firewall counsel in another case in which the Department sought the death penalty.

the FBI, a controlled delivery of illegal aliens from Mexico to Albuquerque, in that some

of the aliens were undercover operatives.  The investigation and prosecution destroyed a

criminal organization, exposed stash houses in Albuquerque, and resulted in multiple

indictments and convictions.

388.    Plaintiff was point of contact and lead prosecutor for human trafficking cases for

two years.

389.    Plaintiff handled specialty cases, such as art crime and violations of the

Endangered Species Act.

390.    Plaintiff handled cases that involved more than one jurisdiction, and thus has

experience in multiple district litigation.[43]

391.    For the last four years of his career, Plaintiff focused on identity theft and

associated crimes, i.e., brank fraud, wire fraud, access device fraud, etc.

392.    For the last four years of his career, Plaintiff handled passport fraud cases.

393.    Plaintiff held a national Top-Secret security clearance for about twenty years

(?).[44]

---

[43] For example, a carjacking that began in one district such as Colorado and ended in another,
New Mexico.

[44] Plaintiff resigned his security clearance.  It was not revoked and was never downgraded.  After
Plaintiff resigned his security clearance, Plaintiff's security clearance was not downgraded.
Many Assistant United States Attorneys do not have the same type of clearance.  A security
clearance can be a burden, particularly after more than a decade.  Sometime after Plaintiff
resigned his security clearance, Plaintiff retired from the Department of Justice in 2021.  To
the best knowledge of Plaintiff, Plaintiff's security clearance at the Top-Secret level **expired**,
for purposes of renewal under a private contractor, a few months ago.  Expired meaning that
most recent background investigation underlying the clearance expired.  The Plaintiff
understands part of the rationale behind the Department's decisions and does not question it
**nor** dispute it; indeed, the Department's decisions may have been intended to benefit the
Plaintiff.  Plaintiff does not know.  It is difficult to identify exact dates.  Plaintiff received the

394.    Plaintiff handled more than 3,000 criminal and civil cases in the United States District Court.

395.    Plaintiff retired from the Department of Justice in 2021.

396.    Plaintiff is a licensed private investigator in the State of New Mexico and can perform investigative functions.

397.    Plaintiff owns a licensed private detective agency, Airedale Analysis, LLC.[45]

398.    Plaintiff is a board-certified professional investigator (ASIS PCI)

399.    Plaintiff has a Master of Business Administration Degree (MBA) from the University of New Mexico and a dozen hours of graduate accounting work beyond his Masters' degree.[46]

400.    Plaintiff is a Certified Fraud Examiner (ACFE).[47]

---

clearance before he received his commission from the Attorney General, and it expired sometime after he left. Plaintiff's security clearance became inactive upon his departure from the Department of Justice, and thus would have been active and in effect for about 20 years. Plaintiff can only assume had he been a security risk at any time during his 20 years in service, or even thereafter, his clearance would have been downgraded. While some intelligence is allowed only to those authorized see it, compartmentalized, SCI, there is no higher level of security clearance within the federal government than the one Plaintiff had. Plaintiff is bound by all the various official secrets acts and will remain so bound for life. Many of the Department machinations about security were mysterious to Plaintiff. To the best knowledge of the Plaintiff, Plaintiff was Top-Secret cleared during his employment and was never at a lower security level, such as Secret or Confidential.

[45] The Plaintiff is co-owner also of a surveillance software firm, CertiSpy, LLC.

[46] The Plaintiff was readmitted to graduate school in 2019 and is a graduate student in accounting at the University of New Mexico. Plaintiff might be eligible to take the Certified Public Accountants' Exam, or is within a course or two of being eligible, but would have to apprentice under an accountant and does not wish to do so. At the graduate level, Plaintiff has more hours in accounting than in any other subject, almost exponentially so. Plaintiff is not overly fond of accounting. Plaintiff is employed as a detective, not as an accountant.

[47] There are generally two types of auditors or examiners: One is an independent auditor who examines a company's books to ensure compliance with Generally Accepted Accounting

401.    Plaintiff is a Certified Forensic Interviewer (CFI).[48]

402.    As an avocation, Plaintiff is a student of history, pragmatism and logic.

403.    Plaintiff has various diplomas, certificates and licenses that define Plaintiff for society's purposes, but the one mantle Plaintiff wears with great price is that of an everyman.

404.    Everything that Plaintiff has accomplished has been accomplished by others; many have accomplished more.

405.    Plaintiff was, at varying times, a television producer, a dishwasher, a glider pilot, an apartment painter, the emissary of an American concern in the far east, a fast-food worker, an advocate for animals rights, a mechanic, a pistol instructor, a forklift driver, a photojournalist, a waiter, a student, a homeowner, a prosecutor, a state-wide campaign organizer, a public affairs officer, a graduate, a student-again, a wanderer in Australia's outback, a karate tournament winner, a marksman, a ticket-taker at a movie theater, a mountain climber, a private attorney, an apartment dweller, a scuba diver, a businessman, an investigator, a father, a newspaper boy.

406.    It is not what Plaintiff has done; Plaintiff **is** each and every one of those people and that is what best qualifies him to represent the Classes, not Plaintiff's diplomas, awards, certifications and other achievements.

407.    Plaintiff is adequate to represent the Classes. [49]

---

Principles (GAAP).  Plaintiff is the other type of auditor.  Plaintiff is not concerned about a whether a company uses GAAP correctly.

[48] Plaintiff is an LSI (Laboratory for Scientific Interrogation) analyst, as well, at both the basic and advanced level.  Plaintiff is perhaps ill-suited to decide what should be listed here.

408.    This action is properly brought as a class action under Federal Rule of Civil

Procedure 23(b) for the following reasons:

**Class Action Status (Fed. R. Civ. P. 23(b)(1)):**

409.    Class action status is warranted under Rule 23(b)(1)(A) because prosecution of

separate actions by the members of the Classes would create a risk of establishing

incompatible standards of conduct for the Defendants.

410.    Class action status is also warranted under Rule 23(b)(1)(B) because prosecution

of separate action by the members of the Classes would create a risk of adjudications

with respect to individual members of the Classes that, as a practical matter, would be

dispositive of the interests of other members not parties to this action, or that would

substantially impair or impede their ability to protect their interests.

**Declaratory and Injunctive Relief (Fed. R. C. P. 23(b)(2)):**

411.    Certification under Rule 23(b)(2) is warranted because Defendants acted or

refused to act on grounds generally applicable to the Classes, thereby making appropriate

final injunctive, declaratory, or other appropriate equitable relief with respect to the

Classes as a whole.

**Superiority (Fed. R. Civ. P. 23(b)(3)): Certification under Rule 23(b)(3):**

---

[49] Plaintiff's service in various roles, special prosecutor, firewall counsel in a death penalty case, and member of numerous taint teams is symptomatic of Plaintiff' desire and capacity to work alone.

412.      Certification is appropriate because questions of law or fact common to members of the Classes predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

413.      The proposed Classes are ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion.

414.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

   b.  Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions:

        i.   In this Action, one damage claim on the part of the Plaintiff and Class members will be easy to identify and calculate: To determine damages from loss of "loss of use" coverage, one would simply look to what the "loss of use" damages were.

        ii.  The "loss of use" damages will have a range starting with zero and with an ascertainable limit.

iii.  The Plaintiff estimates this limit will be between $4,000 and $10,000.[50]

iv.  Given an identifiable input perimeter, an identifiable range and an ascertainable limit, class members can be quickly and easily identified; moreover, compensatory damages for class members will be relatively uniform within the anticipatory range.

b.  This action will promote an orderly and expeditious administration and adjudication of the proposed Classes' claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured.

c.  Without a class action, Class Members will continue to suffer damages.

d.  Defendants' violations of law will proceed without remedy while the Defendants continue to reap and retain the substantial proceeds of wrongful conduct.

e.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

f.  Defendants have access to address information for the Class Members, which may be used for the purpose of providing notice of the pendency of this class action.

g.  Plaintiff seeks damages and equitable relief on behalf of the Classes on grounds generally applicable to the entire proposed Classes.

---

[50] The means by which the Plaintiff came to these conclusions are not complicated but are too cumbersome to be set forth in this pleading.

**Application of New Mexico Law:**

191.    New Mexico law should be applied to the Nationwide Classes because Defendants have violated provisions of the New Mexico criminal code and the events giving rise to Plaintiff's claims occurred in this District.

    a. As Sedgwick handles claims resulting from accidents involving Budget rental vehicles in Albuquerque, the Plaintiff is likely one among others in New Mexico who have suffered a similar fate.

    b. Furthermore, New Mexico has an interest in not only protecting its own consumers but in punishing businesses like the Defendants.

    WHEREFORE, Plaintiff, individually and on behalf of the Extortion, Fraud and Deceptive Practices Classes, as applicable, respectfully requests that the Court enter judgment in his favor and against Sedgwick, as follows:

    a. That the Court certify this action as a class action, proper and maintainable pursuant to Federal Rule of Civil Procedure 23, declare that Plaintiff is the proper class representative and appoint Plaintiff as Class Counsel.

    c. That the Court award Plaintiff and the Classes all statutory damages, including, but not limited to, compensatory, consequential, and general damages in an amount to be determined.

    d. That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law.

e.   That the Court award Plaintiff and the Classes all costs and expenses of the action, including reasonable attorney' fees.

f.   That the Court award pre- and post-judgment interest at the maximum legal rate.

g.   That the Court grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution.

h.   That the Court grant permanent injunctive relief to prohibit Sedgwick from reporting vehicles as total losses when the vehicles are repairable and Budget plans to sell them as used cars.

i.   The Court should further enjoin Sedgwick from referring Parties to collection bureaus before any finding of liability or damages has been made.

j.   That the Court grant all such other relief as it deems just and proper.

## REQUEST THAT THE COURT WAIVE SECURITY

The Plaintiff requests that the Court waive the furnishing of security.

Respectfully Submitted,

__S/ norman cairns_____

**NORMAN CAIRNS**

Plaintiff/Petitioner, Pro Se

Attorney at Law

Bar No. 8929

14009 Oak Butte NE

Albuquerque, New Mexico 87112

normancairns@airedaleanalysis.com

(505) 350-7015

**Certificate of Service**

The preceding pleading will be personally served to the best ability of the undersigned on Defendant Sedgwick Claims Management Service and upon Avis Budget Group and with due diligence.

_____S/ norman cairns_____

Norman Cairns, Esq.

**Certificate of Service**

The preceding pleading was served on Interested Parties, Jesse Mays, AIG Travel Guard, American International Group, Inc. (AIG) 3300 Business Park Drive, Stevens Points, Wisconsin, 54482, and Houston Wholesale Cars, 4718 Lomas Blvd

NE, Albuquerque, NM 87110, by certified mail, signature required, and return receipt

requested

_____S/ norman cairns

Norman Cairns, Esq.